**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DANIEL J. KASSA, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **Case No.:** |
| v. | ) ) ) | |
| DOMINIC J. PILEGGI, MICHAEL L. DUCKER, JEANANNE K. HAUSWALD, DEAN JERNIGAN, RONALD B. KALICH, SR., KENNETH R. MASTERSON, JEAN-PAUL RICHARD, RUFUS H. RIVERS, KEVIN L. ROBERG, DAVID D. STEVENS, ABB LTD., EDISON ACQUISITION CORPORATION,  and THOMAS & BETTS CORPORATION, | ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

Plaintiff Daniel J. Kassa ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on personal knowledge, as follows:

**NATURE OF THE CASE**

1.      Plaintiff brings this class action on behalf of the public stockholders of Thomas & Betts Corporation ("Thomas & Betts" or the "Company") against Thomas & Betts and its Board of Directors (the "Board") seeking equitable relief for their breaches of fiduciary duty and other violations of state law arising out of their attempt to sell the Company to ABB Ltd. ("ABB"). Additionally, Plaintiff, individually, brings a claim against defendants for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9(a) promulgated thereunder.

2.      On January 30, 2012, Thomas & Betts and ABB announced a definitive agreement under which ABB, through its wholly owned subsidiary Edison Acquisition Corporation ("Merger Sub"), will acquire all of the outstanding shares of Thomas & Betts for $72.00 per share in cash (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $4 billion.

3.      The Proposed Transaction, however, is unfair to Thomas & Betts shareholders, does not offer them adequate consideration, was the result of an flawed and hurried process, and is going to be effected through the dissemination of a materially false and misleading proxy statement, as demonstrated by the Schedule 14A Proxy Statement (the "Proxy Statement") filed by Thomas & Betts on February 17, 2012.

4.      The Board members have breached their fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more detail below, given Thomas & Betts' recent performance and positioning for growth, the consideration shareholders are to receive is inadequate and significantly undervalues the Company.

5.      As a result of the Proposed Transaction, the Company's officers and directors will receive unique financial benefits that are not being received by the Company's public shareholders. In particular, the Proposed Transaction will result in: (a) employment arrangements for the Company's senior management with the post-merger company and/or substantial severance payments in the event of their termination following consummation of the Proposed Transaction; and (b) substantial payments to the Company's officers and directors resulting from the vesting of previously restricted and unvested stock.

6.      In addition, the Company conducted a flawed and hurried process where it failed to seek out potential acquirers for the Company. Prior to the execution of the definitive merger

agreement with ABB (the "Merger Agreement"), the Board failed to solicit a single party to seek their interest in acquiring the Company. There was no auction, no market check, and no shopping of the Company.

7.      Moreover, despite the fact that ABB was offering an unfair price, the Company adhered to ABB's rushed schedule, quickly negotiated a transaction, and executed the Merger Agreement with ABB just 13 days after ABB informed Thomas & Betts that ABB was interested in acquiring the Company.

8.      Exacerbating their fiduciary duties, the Board members sat idly by and provided little-to-no oversight over defendant Dominic J. Pileggi ("Pileggi"), the Company's Chairman of the Board and Chief Executive Officer, who served as the Company's lead representative during the negotiations and discussions with ABB. Despite Mr. Pileggi's (and the rest of management's) obvious conflict of interest, the Board never set up a special committee to oversee and handle negotiations. Pileggi continued to act as the Board's negotiator and liaison with ABB. In addition, Deutsche Bank Securities Inc. ("Deutsche Bank"), the Company's financial advisor, had material conflicts of interests that prevented Deutsche Bank from acting in the best interests of the Company.

9.      The Board members further exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, the Board agreed to the following unfair terms in the Merger Agreement: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides ABB with three business days to match any competing proposal in the event one is made; and

(iii) a provision that requires the Company to pay ABB a termination fee of $116 million in order to enter into a transaction with a superior bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of Thomas & Betts.

10.     In an attempt to secure shareholder support for the unfair Proposed Transaction, on February 17, 2012, the Company issued the materially incomplete and misleading Proxy Statement. Notwithstanding the Board's duty to disclose all material information, the Proxy Statement fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision regarding whether to vote in favor of the Proposed Transaction.

11.     The Board members have breached their fiduciary duties of loyalty, candor, due care, independence, good faith, and fair dealing, and Thomas & Betts and ABB have aided and abetted such breaches by Thomas & Betts' officers and directors. Plaintiff seeks to enjoin the Proposed Transaction unless and until defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here,

which had an effect in this district. In addition, Thomas & Betts maintains its principal executive offices in Memphis, Shelby County, Tennessee.

## PARTIES

14.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Thomas & Betts. Plaintiff is a resident of New Jersey.

15.     Thomas & Betts is a corporation organized and existing under the laws of the State of Tennessee. It maintains its principal corporate offices at 8155 T&B Boulevard, Memphis, Tennessee 38125.

16.     Defendant Dominic J. Pileggi has been the Chief Executive and a director of the Company since 2004, and has been Chairman of the Board since 2006. Mr. Pileggi is a resident of Tennessee.

17.     Defendant Michael L. Ducker has been a director of the Company since 2011. Mr. Ducker is a resident of Tennessee.

18.     Defendant Jeananne K. Hauswald has been a director of the Company since 1993. Ms. Hauswald is a resident of Massachusetts.

19.     Defendant Dean Jernigan has been a director of the Company since 1999. Mr. Jernigan is a resident of Tennessee.

20.     Defendant Ronald B. Kalich, Sr. has been a director of the Company since 1998. Mr. Kalich is a resident of Minnesota.

21.     Defendant Kenneth R. Masterson has been a director of the Company since 1995. Mr. Masterson is a resident of Tennessee.

22.     Defendant Jean-Paul Richard has been a director of the Company since 1996. Mr. Richard is a resident of Georgia.

23.     Defendant Rufus H. Rivers has been a director of the Company since 2008. Mr. Rivers is a resident of Maryland.

24.     Defendant Kevin L. Roberg has been a director of the Company since 2007. Mr. Roberg is a resident of California.

25.     Defendant David D. Stevens has been a director of the Company since 2004. Mr. Stevens is a resident of Texas.

26.     Defendants named in ¶¶ 16 through 25 are collectively referred to as the Board.

27.     Defendant ABB is a Switzerland corporation with its headquarters located at Affolternstrasse 44, CH-8050 Zurich, Switzerland. ABB focuses on power and automation technologies aimed at improving performance and lowering the environmental impact for our utility and industrial customers. ABB provides a broad range of products, systems, solutions and services that are designed to improve power grid reliability, increase industrial productivity and enhance energy efficiency.

28.     Defendant Edison Acquisition Corporation is a Tennessee corporation wholly owned by ABB that was created for the purposes of effectuating the Proposed Transaction.

## THE BOARD MEMBERS' FIDUCIARY DUTIES

29.     By reason of their positions with the Company as officers and/or directors, the members of Thomas & Betts' Board are in a fiduciary relationship with Plaintiff and the other public shareholders of Thomas & Betts and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

30.     To comply with their fiduciary duties, the Board members may not take any action that:

    (a)     adversely affects the value provided to the corporation's shareholders;

      (b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

      (c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

      (d)     will provide the Board with preferential treatment at the expense of, or separate from, the public shareholders.

31.     In accordance with their duties of loyalty and good faith, the Board members are obligated to refrain from:

      (a)     participating in any transaction where the Board's loyalties are divided;

      (b)     participating in any transaction where the Board members receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and

      (c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

32.     Plaintiff alleges herein that the Board members, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to plaintiff and other public shareholders of Thomas & Betts.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of Thomas & Betts common stock and their successors in interest, except Defendants and their affiliates (the "Class"). This action is properly maintainable as a class action for the following reasons.

34. The Class is so numerous that joinder of all members is impracticable. As of February 13, 2012, Thomas & Betts has approximately 52 million shares outstanding.

35. Questions of law and fact are common to the Class, including, inter alia, the following:

> (a) Have the Board members breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other members of the Class in connection with the Proposed Transaction;

> (b) Have the Board members breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Transaction;

> (c) Have the Board members breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

> (d) Have the Board members, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

> (e) Whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

          (f)     Have Thomas & Betts, ABB, and Merger Sub aided and abetted the Board members' breaches of fiduciary duty; and

          (g)     Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

36.     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

37.     Plaintiff's claims are typical of those of the other members of the Class.

38.     Plaintiff has no interests that are adverse to the Class.

39.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class. Moreover, conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Furthermore, the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## SUBSTANTIVE ALLEGATIONS

40.     Thomas & Betts is a global leader in the design, manufacture and marketing of essential components used to manage the connection, distribution, transmission and reliability of electrical power in industrial, construction and utility applications. Thomas & Betts has a portfolio of over 200,000 products marketed under more than 45 premium brand names, and has manufacturing facilities in 20 countries.

41.     The Company has been performing well recently and is positioned for growth. For example, on October 20, 2011, the Company issued a press release announcing financial results for its third quarter of 2011, the quarter ended September 30, 2011. Among the financial highlights, the Company reported third quarter 2011 net sales of $604.4 million, up 16.6% compared to the same period in 2010. The Company also reported that net earnings from continuing operations increased 32% in the third quarter, to $54.3 million or $1.03 per diluted share.

42.     In the same press release, defendant Pileggi commented on the Company's strong quarter stating: "Thomas & Betts delivered outstanding financial performance in the third quarter with solid organic sales growth and operating earnings above the high end of our guidance. In addition, our Electrical segment reported a record-high segment margin of 21%, exceeding the previous record set in the third quarter of 2008. We are especially pleased with our performance given the overall negative sentiment in the market around second half 2011 economic growth."

43.     In the same press release, defendant Pileggi further commented on the Company's growth prospects and announced that the Company was raising its 2011 earnings guidance, stating: "For the full-year 2011, we continue to expect solid organic growth to drive consolidated sales improvement in the low-double-digit range. Given the strength of our third quarter performance, we are raising our full-year 2011 operating earnings guidance to a range of $3.40 to $3.45 per diluted share, excluding unusual items. Previously, our earnings range was $3.20 to $3.35 per diluted share."

44.     The Company's success continued into the following quarter. On January 29, 2012, the Company issued a press release announcing financial results for its fourth quarter of 2011, the quarter ending on December 31, 2011. Among the financial highlights, the Company

announced that sales in the quarter were $603.6 million, up 13.4% compared to the fourth quarter of 2010. In addition, the Company reported that net earnings from continuing operations increased 31.2% in the fourth quarter to $52.8 million and that earnings per diluted share increased 30% to $1.00.

45.     In the same press release, defendant Pileggi commented on the Company's strong quarter, stating: "Thomas & Betts finished 2011 on a strong note. Sales increased approximately 14% for both the fourth quarter and full year, while earnings per share grew 30% and 29%, respectively. In a year filled with continued economic challenges, our strong performance demonstrates the fundamental strength of our businesses and the effectiveness of our strategies. Our ability to execute against our plans and rapidly adapt to changing market dynamics helped us deliver organic sales growth of nearly 9% and expand segment margins to over 19% for the full year."

### The Company Enters into the Unfair Proposed Transaction

46.     On January 30, 2012, the Company announced that it had entered into a merger agreement with ABB pursuant to which ABB, through Merger Sub, will acquire all of the outstanding shares of the Company for $72.00 per share.

47.     Given the Company's recent strong performance and positioning for growth, the Proposed Transaction consideration is inadequate and undervalues the Company.

48.     The Proposed Transaction consideration of $72.00 per share represents a small 24% premium when compared to Thomas & Betts' closing stock price on January 27, 2012, the last trading day prior to the announcement of the Proposed Transaction.

49.     In addition, the announcement of the Company's strong financial results for the fourth quarter of 2011 would have likely been viewed positively by investors and would have

resulted in an increase in the Company's stock price. Thus, by announcing the fourth quarter results in conjunction with the announcement of the Proposed Transaction, the Company effectively capped the price Thomas & Betts' stock price could have risen to as a result of positive announcements and overstated the premium that the Proposed Transaction consideration represents.

50.     As recently as August 1, 2011, the Board had determined that a $67.00 per share offer from ABB was "financially inadequate." Just 6 months later, and following two strong quarters by Thomas & Betts, the Board inexplicably agreed to a price that was just 7.46% higher than ABB's financially inadequate offer.

51.     Moreover, the Proposed Transaction consideration fails to adequately compensate Thomas & Betts' shareholder for the significant synergies created by the merger.

52.     The Proposed Transaction is a strategic merger for ABB. The complementary combination of Thomas & Betts' electrical components and ABB's low-voltage protection, control and measurement products would create a broader low voltage portfolio that can be distributed through Thomas & Betts' network of more than 6,000 distributor locations and wholesalers in North America, and through ABB's well established distribution channels in Europe and Asia.

53.     The combined product portfolio and enhanced distribution network will enable ABB to double its addressable market in North America to approximately $24 billion. "Thomas & Betts is a well-run company with strong brands and excellent distribution channels in the world's largest low-voltage products market," said Joe Hogan, ABB's CEO in the press release announcing the Proposed Transaction. "Because our products are complementary, we'll go to market with one of the broadest offerings in the industry. That creates strong growth

opportunities for both ABB and Thomas & Betts, and gives customers and distributors one-stop access to one of the widest ranges of low voltage products. Strategically, it's a great fit, This is another big step toward our goal of expanding our presence in the key North American market. The transaction clearly supports our 2015 growth and profitability targets, and meets all of our return-on-investment criteria for creating shareholder value."

54.     Despite the significant synergies inherent in the transaction for ABB, however, the Board failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to ABB.

55.     Accordingly, the Proposed Transaction consideration is inadequate.

***Thomas & Betts' Executives Officers and Directors Stand to Receive Unique Material Financial Benefits in the Proposed Transaction Not Available to Thomas & Betts' Public Shareholders***

56.     While the Company's shareholders are being cashed out an unfair price, the Company's executive officers and directors will receive substantial unique benefits as a result of the Proposed Transaction. Indeed, as stated in the Proxy, "Thomas & Betts' directors and executive officers have interests in the merger that are different from, or in addition to, those of Thomas & Betts shareholders generally."

57.     First, the Company's executive officers, including defendant Pileggi, have procured post-transaction employment with the ABB/Thomas & Betts entity following consummation of the Proposed Transaction.

58.     As defendant Pileggi stated in a conference call with Thomas & Betts employees and filed with the SEC on February 23, 2012: "I'm also delighted to tell you that Thomas & Betts combined with ABB's North American low voltage products business will become a new global business unit for ABB which will be led by Thomas & Betts' management team and we're

all staying right here in Memphis. So our structure, our strategic initiatives, our management team will remain in place." As further stated in the Proxy, on January 23, 2012, a representative of ABB "indicated to Mr. Pileggi that ABB intended to seek to retain all members of Thomas & Betts' senior management following the acquisition, including Mr. Pileggi for a transitional period post-closing."

59.    In addition, the Company's executive officers and directors hold unvested stock options, restricted stock, performance stock units, and/or restricted shares of the Company that, pursuant to the Merger Agreement, will automatically vest.

60.    The following charts show the amount of previously unvested stock that are held by the Company's officers and directors and the amount they will be able to cash out as a result of the Proposed Transaction:

| Name | Stock Options ($)(a) | | Restricted Stock ($)(b) | | Performance Stock Units ($)(c) |
|---|---|---|---|---|---|
| ***Named Executive Officers*** | | | | | |
| Dominic J. Pileggi | $ | —(d) | $ | 4,495,248 $ | 3,635,136 |
| William E. Weaver, Jr. | $ | 1,017,927 | $ | 833,688 $ | 674,208 |
| Charles L. Treadway | $ | 1,191,974 | $ | 951,120 $ | 848,160 |
| Imad Hajj | $ | —(d) | $ | 664,704 $ | 537,408 |
| J. N. Raines | $ | —(d) | $ | 597,168 $ | 482,832 |
| ***Other Executive Officers*** | | | | | |
| Peggy P. Gann | $ | 398,114 | $ | 320,400 $ | 334,512 |
| Stanley P. Locke | $ | 505,241 | $ | 413,784 $ | 334,512 |

| Name | Restricted Shares (#) | Restricted Shares ($) | |
|---|---|---|---|
| Jeananne K. Hauswald | 2,484 | $ | 178,848 |
| Dean Jernigan | 1,283 | $ | 92,376 |
| Ronald B. Kalich, Sr. | 1,600 | $ | 115,200 |
| Kenneth R. Masterson | 2,250 | $ | 162,000 |
| Jean-Paul Richard | 2,000 | $ | 144,000 |
| David D. Stevens | 150 | $ | 10,800 |

61.     Moreover, Thomas & Betts' named executive officers—Pileggi, William E. Weaver, Jr., Charles L. Treadway, Imad Hajj, J.N. Raines, Peggy Gann, and Stanley P. Locke— are parties to agreements that provide change of control and severance benefits in the event the officer is terminated without "cause" or resigns for "good reason" within three years following consummation of the Proposed Transaction. In such an event, the Company's officers would receive the following amounts:

| Name | Cash ($)(1) | Equity ($)(2) | Pension/ NQDC ($) | Perquisites/ Benefits ($)(3) | Tax Reimbursement $(4) | Total ($) |
|---|---|---|---|---|---|---|
| **Named Executive Officers** | | | | | | |
| Dominic J. Pileggi *Chairman and Chief Executive Officer* | $8,040,437 | $ 8,130,384 | $879,053 | $145,729 | $4,360,831 | $21,556,434 |
| William E. Weaver, Jr. *Senior Vice President and Chief Financial Officer* | $3,041,214 | $2,525,823 | $2,092,843 | $117,291 | $2,448,879 | $10,226,050 |
| Charles L. Treadway *President and Chief Operating Officer* | $3,444,909 | $2,991,254 | $1,992,225 | $116,796 | $2,702,038 | $11,247,222 |
| Imad Hajj *Senior Vice President – International and Operational Development* | $2,639,946 | $1,202,112 | $1,480,350 | $110,532 | $1,758,989 | $7,191,929 |
| J. N. Raines *Vice President—General Counsel and Secretary* | $2,355,719 | $1,080,000 | $721,278 | $100,129 | $1,319,196 | $5,576,322 |
| **Other Executive Officers** | | | | | | |
| Peggy P. Gann *Senior Vice President – Human Resources and Administration* | $1,769,689 | $1,053,026 | $315,260 | $118,404 | $1,109,373 | $4,365,752 |
| Stanley P. Locke *Vice President— Business Development and Strategic Planning* | $1,627,113 | $1,253,537 | $1,865,143 | $92,013 | $1,334,884 | $6,172,690 |

The equity column notes the amount each officer would receive by cashing out their restricted stock, stock options, and performance stock units described above.

62.     Based on the above, the Proposed Transaction is unfair to Thomas & Betts' public shareholders, and represents an effort by the Board members to aggrandize management's and their own financial interests at the expense of and to the detriment of Class members.

***The Flawed Process***

63.     In addition, the Company conducted a flawed and hurried process where it failed to seek out potential acquirers for the Company.

64.     As indicated in the Proxy, on April 19, 2011, a representative of ABB, unsolicited, indicated to senior management of the Company that ABB was "interested in engaging in preliminary discussions concerning a possible business combination transaction with Thomas & Betts." Over the following months, the parties engaged in discussions and negotiations regarding a potential transaction until ABB withdrew their interest on September 6, 2011. During this time, Pileggi served as the lead negotiator on behalf of the Company.

65.     Then, on December 28, 2011, again unsolicited, a representative of ABB called Pileggi to indicate that he intended to call Pileggi on January 16, 2012 in connection with "potentially re-engaging in discussions regarding a potential business combination transaction between ABB and Thomas & Betts."

66.     On January 16, 2011, a representative of ABB "called Mr. Pileggi to inform him that ABB was interested in re-engaging in discussions with Thomas & Betts concerning a potential business combination . . . ." ABB indicated that its willingness to continue negotiations was contingent upon reaching a definitive agreement on or before January 30, 2012.

67.     Despite the fact that ABB was offering an unfair price, the Company adhered to ABB's rushed schedule, quickly negotiated a transaction (negotiations that were led by Pileggi),

16

and executed the Merger Agreement by January 29, 2011, just 13 days after ABB informed

Pileggi that ABB was interested in acquiring the Company.

68.     From April 19, 2011, when ABB originally indicated their unsolicited interest in

acquiring the Company, through the execution of the Merger Agreement on January 29, 2012,

the Board failed to solicit a single party to seek their interest in acquiring the Company. There

was no auction, no market check and no shopping of the Company. Indeed, on at least four

occasions—August 1, 2011, August 8, 2011, January 17, 2012, and January 25, 2012—the Board

discussed potential alternative buyers, but inexplicably failed to contact any of them.

69.     In fact, earlier in 2011, a company described as Company X in the Proxy

Statement had submitted an unsolicited offer to acquire the Company. Company X eventually

withdrew its proposal on August 8, 2011 in light of market conditions. After ABB reengaged in

discussions with the Company in January 2012, the Board never reached out to Company X to

seek out whether they would be interested in reengaging in discussions with the Company, which

is especially troubling considering market conditions were improving and Company X may have

likely been interested in acquiring the Company.

70.     Exacerbating their fiduciary duties, the Board further sat idly by and provided

little-to-no oversight over defendant Pileggi, who served as the Company's lead representative

during the negotiations and discussions with ABB and Company X. Despite Pileggi's (and the

rest of management's) obvious conflict of interest, the Board never set up a special committee to

oversee and handle negotiations. Pileggi continued to act as the Board's negotiator and liaison

with ABB.

71.     In addition, it appears that the Company's financial advisor, Deutsche Bank had material conflicts of interest that prevented Deutsche Bank from acting in the best interests of the Company.

72.     Deutsche Bank and its affiliates have a substantial business relationship with ABB. In fact, prior to Deutsche Bank's retention by Thomas & Betts, Deutsche Bank had engaged in meetings with ABB, suggested that ABB look into acquiring Thomas & Betts, and acted on ABB's behalf in setting up the first meeting between ABB and Thomas & Betts. As stated in the Proxy Statement:

> In January 2011, representatives of Deutsche Bank met with members of ABB's senior management as part of Deutsche Bank's regular business development efforts. In the course of general discussions regarding ABB's business and strategy, Deutsche Bank and ABB discussed several potential acquisition candidates, including Thomas & Betts.

> On March 3, 2011, representatives of Deutsche Bank again met with members of ABB's senior management as part of Deutsche Bank's regular business development efforts. At this meeting, in the course of general discussions regarding ABB's business and strategy, members of ABB's senior management indicated to representatives of Deutsche Bank that ABB was interested in an introductory meeting with Thomas & Betts' senior management to express potential interest in a possible business combination transaction between Thomas & Betts and ABB. Following this meeting representatives of Deutsche Bank called Dominic J. Pileggi, the Chairman and Chief Executive Officer of Thomas & Betts, to let him know of ABB's interest in setting up a meeting.

73.     Moreover, Deutsche Bank is an affiliate of Deutsche Bank AG (together with its affiliates, the "DB Group"). Currently, members of the DB Group are providing services to ABB or its affiliates, earning €9.4 million in the past two years. The DB Group also expects to perform additional services for ABB and Thomas & Betts in the future. As stated in the Proxy Statement:

> One or more members of the DB Group have, from time to time, provided, and are currently providing, investment banking, commercial banking (including extension of credit) and other financial services to ABB or its affiliates for which they have received compensation of approximately €9.4 million in the last two years, including having acted as joint bookrunner and mandated lead arranger with respect to a pricing and maturity amendment to ABB's existing $2 billion

revolving credit facility in November 2010 and as joint lead manager with respect to an offering of 4.00% senior unsecured notes due June 2021 by ABB Treasury Center (USA), Inc. (aggregate principal amount $650 million) in June 2011. The DB Group may also provide investment and commercial banking services to ABB and Thomas & Betts in the future, for which the DB Group would expect to receive compensation. In the ordinary course of business, members of the DB Group may actively trade in the securities and other instruments and obligations of ABB, Thomas & Betts and their respective affiliates for their own accounts and for the accounts of their customers. Accordingly, the DB Group may at any time hold a long or short position in such securities, instruments and obligations.

As a result of Deutsche Bank's significant and valuable relationship with ABB, one they wish to maintain, Deutsche Bank was predisposed to favoring ABB and ensuring that the Company entered into a deal with ABB, as opposed to other potential parties. Despite the disabling conflicts of interest, Thomas & Betts inexplicably retained Deutsche Bank to serve as its financial advisor.

***The Preclusive Deal Protection Devices***

74.     In an effort to lock up the benefits described above, and in further breach of their fiduciary duties, defendants have conspired to insulate the Proposed Transaction through the use of onerous deal protection devices that preclude competing bidders from making a successful bid for Thomas & Betts to compete with the unfair deal. The preclusive deal protection devices are all the more unreasonable considering the Board failed to conduct any form of pre-market check whatsoever.

75.     For example, section 6.4 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by ABB. Section 6.4(a) demands that the Company terminate any and all prior or on-going discussions with other potential acquirers. During its negotiations with ABB, the Company realized of the necessity of having a go-shop period considering it had failed to conduct a pre-signing market check. As stated in the Proxy,

"representatives of Davis Polk [(Thomas & Betts' counsel)] raised the possibility that Thomas & Betts may seek a "go-shop" provision in its revised draft of the merger agreement, which would permit Thomas & Betts to solicit alternative acquisition proposals for a period of time after the execution of a merger agreement with ABB." ABB was against such a provision and Thomas & Betts adhered to their will at the expense of the Company's shareholders. As stated in the Proxy, "the representatives of Kirkland & Ellis responded that such a provision would be unacceptable to ABB, and later on January 23, 2012 a representative of ABB called a representative of Thomas & Betts to confirm and reiterate to Thomas & Betts that a go-shop provision would be unacceptable to ABB." No go-shop provision was included in the Merger Agreement.

76.     Pursuant to Section 6.4(c) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify ABB of the bidder's identity and the terms of the bidder's offer. Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with ABB in order to enter into the competing proposal, it must grant ABB three business days in which the Company must negotiate in good faith with ABB (if ABB so desires) and allow ABB to amend the terms of the Merger Agreement to "make such adjustments in the terms and conditions of [the Merger] Agreement so that such Acquisition Proposal would cease to constitute a Superior Proposal." In other words, the Merger Agreement gives ABB access to any rival bidder's information and allows ABB a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor ABB and piggy-back upon the due diligence of the foreclosed second bidder.

77.     The Merger Agreement also provides that a termination fee of $116 million plus an expense reimbursement up to $20 million must be paid to ABB by Thomas & Betts if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

78.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

***The Materially Misleading and Incomplete Proxy Statement***

79.     To make matters worse, defendants are withholding material information about the Proposed Transaction from Thomas & Betts' public shareholders. The Proxy Statement, pursuant to which the Board has recommended that Thomas & Betts shareholders approve the merger, contains numerous material omissions and misstatements, in contravention of the Board's duty of candor and full disclosure under state law.

80.     ***The Company's Financial Forecasts.*** The Proxy Statement fails to disclose material information concerning the Company's financial forecasts, including:

(a)     disclosure of all line items that were used in calculating the Company's free cash flow forecasts, including tax-effected EBIT, depreciation and amortization expense, share-based compensation expense, purchases of property, plant and equipment, and working capital;

(b)        the assumptions used to prepare the 2011 strategic plan projections, the 2012 budget projections, and the 2012 growth case projections, including the assumptions related to new product offerings, price increases, customer demand, industry performance, competition, general business, economic, market and financial conditions, and North American industrial production rates and residential and non-residential construction rates; and

(c)        the reasons the Company instructed Deutsche Bank to utilize the 2012 projections contained in the 2012 budget projections as opposed to the 2012 projections contained in the three-year 2011 strategic plan projections.

81.        ***Summary of Deutsche Bank's Financial Analyses.*** The Proxy also fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, Deutsche Bank, including:

(a)        with respect to the *Comparable Companies Analysis*, the criteria used to determine which companies were considered similar to the company and used in the analysis, the P/E multiples observed for each company in the analysis, and the criteria used to s elect the EPS multiple range of 13.5x to 15.1x;

(b)        with respect to the *Discounted Cash Flow Analysis*, the criteria used to select the perpetuity growth rates ranging from 2.0% to 3.0% and the key inputs used to calculated the Company's weighted average cost of capital that was used in selecting the discount rate range of 10.5% to 11.0%;

(c)    with respect to the *Precedent Transactions Analysis*, the criteria used to select the transactions used in the analysis, the LTM EBITDA multiples observed for each company in the analysis, and the criteria used to select the EBITDA multiple range of 9.0x to 10.0x;

82.    ***Post-Transaction Employment Opportunities.*** The Proxy Statement fails to disclose material information concerning the post-transaction employment opportunities for the Company's senior management, including defendant Pileggi. The Proxy Statement merely states that on January 23, 2012, a representative of ABB "indicated to Mr. Pileggi that ABB intended to seek to retain all members of Thomas & Betts' senior management following the acquisition, including Mr. Pileggi for a transitional period post-closing…" The Proxy Statement must provide more detail as to the current status of the discussions and negotiations between ABB and Thomas & Betts' senior management as to their post-transaction retention, as well as the terms of any agreements that have been reached.

83.    ***The Sales Process Preceding the Execution of the Merger Agreement.*** The Proxy Statement also fails to disclose material information concerning the events leading up to the announcement of the Proposed Transaction, including information pertaining to the reasons the Board determined not to conduct a pre-signing market check, discussions and negotiations with ABB, and the Company's strategic alternatives. In particular, the Proxy Statement fails to disclose:

(a)    the reasons the Board did not form a special committee to run a sales process and oversee the negotiations with ABB, Company X and any other potential acquirers, but rather allowed Pileggi and the conflicted Deutsche Bank to run the process;

(b)      the "strategic alternatives" discussed by the Board on May 5, 2011, August 1, 2011, and January 25, 2012;

(c)      whether the Board considered other financial advisors, and if so, the reasons the Company retained Deutsche Bank over the other potential advisors;

(d)      the "extent of Deutsche Bank's business relationships with Company X" discussed by the Board on August 1, 2011;

(e)      the reasons considered by the Board on August 1, 2011 in "conclud[ing] that Deutsche Bank's ability to serve as the company's financial advisor was not impaired and that the circumstances did not warrant the engagement of a different financial advisor";

(f)      how many "potential alternative buyers" were discussed by the Board on August 1, 2011, and what the Board determined after reviewing such potential buyers;

(g)      the different forms of market check discussed by the Board on August 8, 2011, as well as the "merits and considerations" of the various forms of market check discussed by the Board;

(h)      how many "potential alternative buyers" were discussed by the Board on August 8, 2011;

(i)      what the Board determined when it discussed on August 1, 2011 "how the strategic fit between Thomas & Betts and ABB might affect the ability of potential alternative buyers to meet or exceed ABB's proposed price";

(j)      when Pileggi first informed the Board that ABB had informed Pileggi on December 28, 2011 that ABB was planning on re-engaging in discussions with the Company;

(k)     how many "potential alternative buyers" were discussed by the Board on January 17, 2012, as well as the "likelihood that any such buyers would match or exceed the per share price proposed by ABB" that was discussed by the Board at that same meeting;

(l)     the reasons the Board did not recontact Company X following ABB's reexpression of interest in January 2012; and

(m)     the "relative benefits and drawbacks of a post-announcement market checked compared with a pre-signing market check" that was discussed by the Board on January 25, 2012.

84.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty – Failure to Maximize Shareholder Value
### (Against the Board Members)

85.     Plaintiff repeats all previous allegations as if set forth in full herein.

86.     The Board members have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Thomas & Betts and have acted to put their personal interests ahead of the interests of Thomas & Betts shareholders.

87.     The Board's recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize Thomas & Betts' value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

88.     The Board members have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of Thomas & Betts because, among other reasons:

(a)      they failed to take steps to maximize the value of Thomas & Betts to its public shareholders and took steps to avoid competitive bidding;

(b)      they failed to properly value Thomas & Betts; and

(c)      they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

89.      As a result of the Board members' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Thomas & Betts' assets and will be prevented from benefiting from a value-maximizing transaction.

90.      Unless enjoined by this Court, the Board members will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

91.      Plaintiff and the Class have no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty – Failure to Disclose Material Information**
**(Against the Board Members)**

92.      Plaintiff repeats all previous allegations as if set forth in full herein.

93.      The fiduciary duties of the Board in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Thomas & Betts' shareholders.

94.       As set forth above, the Board members have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

95.      As a result, Plaintiff and the Class members are being harmed irreparably.

96.      Plaintiff and the Class have no adequate remedy at law.

**COUNT III**
**Aiding and Abetting**
**(Against Thomas & Betts, ABB, and Merger Sub)**

97.     Plaintiff repeats all previous allegations as if set forth in full herein.

98.     As alleged in more detail above, Defendants Thomas & Betts, ABB, and Merger Sub have aided and abetted the Board's breaches of fiduciary duties.

99.     As a result, Plaintiff and the Class members are being harmed.

100.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

(B)     enjoining, preliminarily and permanently, the Proposed Transaction;

(C)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Respectfully submitted,

SPRAGINS, BARNETT & COBB, PLC

/s/ Lewis L. Cobb_____
LEWIS L. COBB #5369
Attorneys for Plaintiff
312 E. Lafayette, P.O. Box 2004
Jackson, TN 38302-2004
731-424-0461
lewiscobb@spraginslaw.com

LEVI & KORSINSKY, LLP
W. Scott Holleman, Esq.
Joseph Levi, Esq.
30 Broad Street, 15th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171